**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**INTERNATIONAL ASSOCIATION OF**
**SHEET METAL, AIR, RAIL AND**
**TRANSPORTATION WORKERS**
**(SMART)—TRANSPORTATION**
**DIVISION,** *et al.*,

　　　　　　　　　Plaintiffs,

　　　　v.

**NATIONAL MEDIATION BOARD**,

　　　　　　　　Defendant,

and

**BNSF RAILWAY COMPANY,** *et al.*,

　　　　　　　　Defendant-Intervenors.

---

Case No. 1:20-cv-02098 (TNM)

## <u>MEMORANDUM OPINION</u>

The International Association of Sheet Metal, Air, Rail and Transportation Workers—Transportation Division ("SMART-TD") seeks declaratory and injunctive relief after the National Mediation Board ("NMB") tapped SMART-TD's vice president to represent SMART-TD's subunits in arbitrations with rail carriers. SMART-TD argues that the NMB lacked statutory authority to make this designation because there is another arbitration pending elsewhere that preempts the new arbitrations.

But SMART-TD's position misconstrues the language of the governing statute, the Railway Labor Act ("RLA"). This Act provides when and how the NMB must designate representatives to participate in arbitrations. And the NMB complied with its obligations here. And the RLA allocates elsewhere responsibility for answering these potentially tricky

preemption questions.  The Court will thus deny SMART-TD's motion for a preliminary injunction and grant the NMB's motion to dismiss.

## I.

The RLA is an "ambitious" statute that provides procedures for "the prompt and orderly settlement of all disputes [between rail carriers and their employees] concerning rates of pay, rules, or working conditions, in order to avoid any interruption to commerce or to the operation of any carrier engaged therein."  *Nat'l R.R. Passenger Corp. v. Transp. Workers Union of Am.*, 373 F.3d 121, 123 (D.C. Cir. 2004) (cleaned up).

"To effectuate peaceful dispute resolution, the RLA sets out a mandatory and virtually endless process of negotiation, mediation, voluntary arbitration, and conciliation."  *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers-Transp. Div.*, 973 F.3d 326, 334 (5th Cir. 2020) (cleaned up).  It prescribes distinct procedures for resolving "major" disputes (which arise when "a party seeks new agreement terms affecting rates of pay, rules, or working conditions") and "minor" ones (which "relate[] either to the meaning or proper application of a particular provision" in a collective bargaining agreement).  *Id*. at 334–35 (cleaned up).  As relevant here, the RLA allows for arbitration of minor disputes in one of two fora:  The National Railroad Adjustment Board ("Adjustment Board") or a Public Law Board ("PLB").[1]  The various boards discussed by the RLA are as follows:

- Adjustment Board.  A statutorily created arbitration board that considers disputes related to "the interpretation or application of agreements concerning rates of pay,

---

[1]  The parties do not ask—and the Court need not decide—whether their dispute is "major" or "minor" under the RLA.  They litigated that question before the Fifth Circuit.  *See BNSF Ry. Co.*, 973 F.3d at 335–37.  The issue here is the role of the NMB in arbitrations that seek to resolve minor disputes.

rules, or working conditions[.]" *Slocum v. Del., L. & W.R. Co.*, 339 U.S. 239, 240 (1950) (cleaned up); *see* 45 U.S.C. § 153, First.

- <u>PLB</u>.[2]  Either a rail carrier or labor union can issue a written request to the other to form a PLB "to resolve disputes otherwise referable to the Adjustment Board," or if a dispute "has been pending before the Adjustment Board for twelve months." *See* 45 U.S.C. § 153, Second ¶ 2.  Each party then designates a "partisan member" to represent it on the PLB.  *Id.*  The partisan members decide "all matters" not already agreed to on the "establishment and jurisdiction" of the PLB.  *Id.*  If they cannot agree on these matters, they can jointly appoint a neutral member (known as the "procedural neutral") to resolve any such dispute.  *Id.*

- <u>NMB</u>.  Unlike the prior boards, the NMB is an independent federal agency.  As relevant here, the NMB becomes involved in PLB arbitrations in one of two circumstances:  If a party does not designate a partisan member, or if the partisan members are designated but fail to jointly appoint a procedural neutral.  *Id.*  In either case, one side can ask the NMB to designate the partisan member or procedural neutral.  *Id.*  And the NMB "shall promptly" make the designation "[u]pon receipt of a request."  *Id.*

\*       \*       \*

SMART-TD is a labor organization that represents the "craft or class of train service employees employed by the nation's Class I railroads."  Compl. ¶ 10, ECF No. 1.  SMART-TD represents employees of BNSF Railway Company, Inc., The Kansas City Southern Railway

---

[2]  The text of the RLA refers to a Public Law Board as a "special board of adjustment."  *See* 45 U.S.C. § 153, Second ¶ 2.

Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company (collectively, the "Railroads"). *Id.* It consists of "General Committees of Adjustment ('GCAs'), which are semi-autonomous subordinate bodies typically consisting of employees of a single [rail] carrier which perform a number of tasks, including bargaining with the carrier(s) to make and maintain agreements pertaining to local matters." *Id.*

This year, SMART-TD and 23 of its GCAs challenged in this Court the Railroads' efforts to form a PLB arbitration. *See Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers (SMART)—Transp. Div. et al. v. Nat'l Mediation Bd.*, 1:20-cv-00200-TNM (D.D.C. Jan. 25, 2020) ("*SMART-TD I*"). The Railroads had sought a PLB to address whether "moratorium provisions" in agreements with the GCAs prevented their proposals to change the "crew consist" (that is, the number of conductors and trainmen assigned to work on a train).[3] Compl. ¶¶ 5, 27, *SMART-TD I*. The Railroads requested to arbitrate this dispute through "national handling"—on a nationwide level with multiple rail carrier employers acting collectively. *Id.* ¶¶ 23, 27. SMART-TD refused to create a PLB or appoint a partisan member. *Id.* ¶ 28.

In response, the Railroads asked the NMB to designate SMART-TD's president as its partisan member. *Id.* And the NMB did so over SMART-TD's objections. *Id.* ¶¶ 30–31.

SMART-TD and its GCAs then sued the NMB, arguing that the NMB's decision to designate SMART-TD's president violated the RLA and Administrative Procedure Act ("APA"). *Id.* ¶¶ 33–42. They claimed in part that only a single rail carrier could ask the NMB to designate a partisan member. *Id.* ¶ 37. They also moved for a preliminary injunction vacating the NMB's

---

[3] There are "over 20 separate local agreements involving crew consist" between various GCAs and the Railroads. Compl. ¶ 25. These agreements include a "moratorium provision" precluding "either the rail carrier or the union from proposing changes to the crew consist agreement until after attrition of all protected employees or similar preconditions." *Id.* ¶ 26 (cleaned up).

designation.  *See* Pls.' Mot. for Prelim. Inj., *SMART-TD I*, ECF No. 13.

The NMB moved to dismiss the complaint.  *See* Def.'s Mot. to Dismiss, *SMART-TD I*,

ECF No. 24.  And the Railroads intervened as defendants and opposed the preliminary

injunction.  *See* Mot. to Intervene, *SMART-TD I*, ECF No. 17; Def.-Intervenors' Opp'n, *SMART-TD I*, ECF No. 23.  The Court held a consolidated hearing on the merits.  *See* Min. Entry (May 8,

2020).  But it never issued a ruling.  A week after the merits hearing, the Railroads withdrew

their request to form the PLB and moved to dismiss the case as moot.  *See* Def.-Intervenors'

Suggestion of Mootness, *SMART-TD I*, ECF No. 37.  In doing so, they noted that they "still

intend to pursue their respective moratorium claims against SMART-TD on a single-carrier

basis."  *Id.*  SMART-TD agreed the case was moot.  *See* Pls.' Resp. to Suggestion of Mootness,

*SMART-TD I*, ECF No. 38.  So the Court dismissed the case.  Order, *SMART-TD I*, ECF No. 39.

But that was not the end of the line for this dispute.  On the same day the Court dismissed

*SMART-TD I*, each Railroad separately served requests on the GCAs to establish PLBs to

arbitrate the same dispute over whether moratorium provisions prohibited changes to the crew

consist.  Compl. ¶ 37.  Each Railroad also asked the GCAs to designate a partisan member to

participate in these PLB arbitrations.  *Id.*  None of the GCAs agreed to join the PLBs or appoint a

partisan member to represent them.  *Id.*

Instead, more than a week later, the GCAs filed Notices of Intent to Arbitrate with the

Adjustment Board, and they served these notices on the Railroads.  *Id.* ¶ 38.  The GCAs then

argued to the Adjustment Board that the Railroads' requests for arbitration in the PLBs "were

both untimely and procedurally deficient and therefore could not be addressed on the merits by

any arbitral body."  *Id.* ¶ 40.  The Adjustment Board docketed the Notices of Intent and set an

August deadline for the GCAs' submissions.  *Id.* ¶ 41.

Meanwhile, after the GCAs failed to appoint partisan members to the PLB arbitrations, the Railroads requested that the NMB designate one on the GCAs' behalf. *Id.* ¶ 42. The GCAs again objected. They argued that the Adjustment Board's "assumption of jurisdiction precluded the NMB from acting on the [Railroads'] requests." *Id.* ¶ 44. But the NMB appointed Brent Leonard—SMART-TD's vice president—to serve as the partisan member for each GCA in the PLB arbitrations. *Id.* ¶ 45.

SMART-TD and its GCAs now sue the NMB again under the RLA and APA.[4] SMART-TD claims the NMB exceeded its statutory authority when it designated Leonard to serve as the partisan member for the GCAs. *Id.* ¶¶ 49–54.

As before, SMART-TD also filed a motion for preliminary injunction to vacate the designation and prevent the NMB from taking any more action on these PLBs. *See* Pls.' Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 9.

The Railroads again intervened and now oppose the preliminary injunction motion. *See* Min. Order (Aug. 13, 2020) (granting Railroads' unopposed motion to intervene); Def.- Intervenors' Opp'n to Mot. for Prelim. Inj. ("Def.-Intervenors' Opp'n"), ECF No. 18. The NMB also opposes the motion and moves to dismiss the Complaint. *See* Mem. in Supp. of Def.'s Mot. to Dismiss & Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 20-1.

SMART-TD's motion for a preliminary injunction and the NMB's motion to dismiss are now ripe for disposition.[5]

---

[4] The Court will refer to Plaintiffs collectively as "SMART-TD."

[5] The Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331. The Court finds that it need not hold a hearing to resolve either motion. *See* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the Court."). In addition to the extensive briefing here, it had the benefit of the parties' oral

## II.

"A preliminary injunction is 'an extraordinary remedy never awarded as of right,' but as an exercise of discretion by a court sitting in equity." *Capitol Hill Baptist Church v. Bowser*, --- F. Supp. 3d ---, 2020 WL 5995126, at *3 (D.D.C. Oct. 9, 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  A party seeking a preliminary injunction must make a clear showing that it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 22.

Since *Winter*, the D.C. Circuit has suggested that a "likelihood of success is an independent, free-standing requirement for a preliminary injunction." *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (cleaned up).  But it still "remains an open question." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  Two principles, however, are clear.

First, success on the merits is the "most important factor." *Id.* at 1038.  It is "foundational." *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019).  So the D.C. Circuit has declined to consider the other preliminary injunction factors if a party cannot show a likelihood of success on the merits. *See id.* at 10 ("And because the plaintiffs have shown no likelihood of success on the merits, we choose not to proceed to review the other three preliminary injunction factors." (cleaned up)); *Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011) ("When a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors." (citing cases)).

Second, the D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of*

---

arguments during the merits hearing in *SMART-TD I*, which involved the same statutory provision here and substantially similar facts.

*Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The alleged injury "must be both certain and great; it must be actual and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  And it must be "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (cleaned up) (emphasis in original).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead sufficient factual allegations that, if true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is insufficient if it merely offers "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (cleaned up).  The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

Courts must construe the complaint in the light most favorable to the plaintiff and accept as true all reasonable factual inferences drawn from well-pleaded allegations. *See Pollard v. District of Columbia*, 698 F. App'x 616, 619 (D.C. Cir. 2017).

The Norris-LaGuardia Act ("NLGA") imposes heightened standards for a party seeking injunctive relief in cases "involving or growing out of a labor dispute."  29 U.S.C. § 101.  The NLGA defines "labor dispute" to include either "any controversy concerning terms or conditions of employment," or "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." *Id.*

§ 113(c).

In cases "involving or growing out of a labor dispute," a court cannot order an injunction unless it determines that the moving party will suffer "substantial and irreparable injury." *Id.* § 107.  And an injunction is prohibited if the moving party "has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." *Id.* § 108.

### III.

The crux of SMART-TD's challenge is this:  The NMB exceeded its authority under the RLA when, at the Railroads' request, it designated Leonard to serve as each GCA's partisan member in the proposed PLB arbitrations, which involve "the same labor disputes [that] were already before the [Adjustment Board] (but for less than 12 months)."  Pls.' Reply Mem. in Supp. of Pls.' Mot. for Prelim. Inj. & Opp'n to Mot. to Dismiss ("Pls.' Reply") at 19–20, ECF No 23.[6]  And this designation now compels the GCAs to participate in the PLB arbitrations unless the Court issues an injunction.  Pls.' Mot. at 25–28.

SMART-TD's argument derails on the first premise.  Congress carved out only a limited, largely ministerial role for the NMB as it relates to PLB arbitrations.  And the NMB satisfied its obligation here.  SMART-TD can, and must, raise its challenges in the PLB arbitrations.

### A.

The Court first considers whether SMART-TD has shown a likelihood of success on the merits to support injunctive relief and stated a claim under the RLA and APA to survive the NMB's motion to dismiss.  This question hinges on the scope of the NMB's authority to designate a partisan member to represent either a rail carrier or labor union in a PLB arbitration.

---

[6]  All page citations refer to the pagination generated by the Court's CM/ECF system.

This "interpretive task begins with the statute's language." *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008). Section 153, Second of the RLA provides:

> If such carrier or such representative fails to agree upon the establishment of [a PLB] as provided herein, or to exercise its rights to designate a [partisan] member of the [PLB], the carrier or representative making the request for the establishment of the [PLB] may request the [NMB] to designate a [partisan] member of the [PLB] on behalf of the carrier or representative upon whom such request was made. *Upon receipt of a request for such designation the [NMB] shall promptly make such designation and shall select an individual associated in interest with the carrier or representative he is to represent*, who, with the [partisan] member appointed by the carrier or representative requesting the establishment of the [PLB], shall constitute the [PLB].

45 U.S.C. § 153, Second ¶ 2 (emphasis added). There is no ambiguity in this language. The NMB only becomes involved if a party fails to (1) "agree upon the establishment of [a PLB]" or (2) "exercise its rights to designate a [partisan] member of the [PLB]." *Id.* In these limited circumstances, the party seeking to establish the PLB arbitration can ask the NMB to designate a partisan member to represent that other party. *Id.* Once the NMB receives the "request for such designation," it "shall promptly" designate an "individual associated in interest" to serve as that party's partisan member in the PLB arbitration. *Id.*

The word "shall" imposes a mandatory duty on the NMB to designate a partisan member. It is not discretionary. *See Murphy v. Smith*, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a mandate, not a liberty."). By its plain terms, the RLA places no other prerequisites before the NMB must designate the partisan member. The only event to trigger this obligation is "receipt of a request for such designation." 45 U.S.C. § 153, Second ¶ 2. The word "promptly" also suggests this is a straightforward, ministerial task, not one requiring careful factfinding or legal analysis.

The NMB followed its statutory mandate here. The Railroads asked SMART-TD

to establish a PLB arbitration and appoint a partisan member to resolve their dispute over whether the moratorium provisions barred changes to the crew consist.  Def.-Intervenors' Opp'n at 13–14.  SMART-TD declined.  *Id.* at 15.  So the Railroads made a "request for such designation" to the NMB.  *Id.* at 16.  The NMB then designated Leonard.  *Id.*  It thus satisfied its statutory obligation.

*     *     *

SMART-TD's arguments to the contrary are unpersuasive.  According to SMART-TD, the RLA does not "sanction[] the NMB to facilitate the establishment of a PLB that is otherwise barred."  Pls.' Reply at 21.  So the NMB should have, upon receiving the Railroads' request, declined to designate Leonard as a partisan member because the Adjustment Board arbitration involved the same dispute and was pending less than twelve months.  Pls.' Mot. at 22–25.  This line of reasoning, however, stretches the RLA beyond its plain meaning.

SMART-TD's argument assumes that the NMB must examine whether a PLB is properly established before it can designate a partisan member.  But that is a duty Congress explicitly allocated elsewhere.

The Court again need not look beyond the text of Section 153, Second.  It provides:

> The *[partisan] members of the [PLB] so designated shall determine all matters* not previously agreed upon by the carrier and the representative of the employees with respect to the *establishment and jurisdiction of the [PLB]*.  If they are unable to agree *such matters shall be determined by a neutral member of the [PLB]* selected or appointed and compensated in the same manner as is hereinafter provided with respect to situations where the [partisan] members of the [PLB] are unable to agree upon an award.  Such neutral member shall cease to be a member when he has determined such matters.

45 U.S.C. § 153, Second ¶ 2 (emphasis added).  So "all matters" related to the "establishment and jurisdiction" of the PLB are handled in one of three ways:

First, "the carrier and the representative of the employees" can agree to these matters. *Id.*
Second, the PLB's partisan members—one of whom the NMB may designate—can resolve any
such dispute. *Id.* And third, if these options fail, the partisan members can select a neutral
person (a "procedural neutral") or ask the NMB to do so. *Id.* And "upon receipt of such request
the [NMB] shall promptly make such appointment."[7] *Id.*

Section 153, Second thus provides a comprehensive framework for resolving disputes
over the establishment and jurisdiction of a PLB. And it contemplates only a narrow role for the
NMB. At most—and only if asked—the NMB designates the individual tasked with resolving
such issues. That can be the partisan member "so designated." *See id.* ("The members of the
board *so designated shall determine all matters* not previously agreed upon by the carrier and the
representative of the employees *with respect to the establishment and jurisdiction of the [PLB]*."
(emphasis added)). Or it can be the procedural neutral the NMB designates if the partisan
members cannot agree to one. *Id.* The RLA leaves no place for the NMB to resolve these
disputes on its own.[8]

SMART-TD's argument invites the Court to ignore the RLA's plain language. But there
would be no need for the partisan members or procedural neutral to decide "all matters" related
to the "establishment and jurisdiction" of the PLB if, as SMART-TD insists, the NMB had to

---

[7] The RLA requires that the procedural neutral be "selected or appointed and compensated in the
same manner" as neutral persons are selected and appointed "with respect to situations where the
[partisan] members are unable to agree upon an award." 45 U.S.C. § 153, Second ¶ 2. This is
how a neutral person is selected when the partisan members cannot agree to an award.

[8] The parties have already started this process. After the NMB designated Leonard as the
GCAs' partisan member to the PLB arbitrations, he and the Railroads' representative selected a
procedural neutral to resolve their disputes over the PLBs. Reply in Supp. of Def.'s Mot. to
Dismiss at 2 n.3, ECF No. 25. The procedural neutral declined the assignment, but the "NMB
will continue the process for selecting a procedural neutral." *Id.*

resolve such issues *before* designating either. *Id.* SMART-TD's argument thus must fail. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (cleaned up)).

Although SMART-TD points to cases in which the NMB has properly refused to designate a partisan member, these instances went directly to NMB's limited role envisioned by the statute, not to the establishment and jurisdiction of the PLB. Pls.' Mot. at 24.

In *Chicago, Rock Island & Pacific Railroad Co. v. National Mediation Board*, a rail carrier asked a collective bargaining representative to form a PLB to resolve a conductor's dispute that he filed with the Adjustment Board. 435 F.2d 339, 340 (7th Cir. 1970). The representative declined so the rail carrier asked the NMB to designate the partisan member. *Id.* The NMB also declined the request. And the court affirmed. It reasoned that Section 153, Second of the RLA only allowed the NMB to designate a "certified union or the union selected by the individual employees for processing their grievances." *Id.* at 341. Since the collective bargaining representative did not represent the conductor in his dispute before the Adjustment Board, it was not a "representative" under the RLA that the NMB could designate as the conductor's partisan member. *Id.*

A district court reached a similar result in *Long Island Rail Road Co. v. National Mediation Board*, No. 68-C-240, 1968 WL 9313 (E.D.N.Y. Dec. 31, 1968). There, the court agreed with the NMB's decision not to designate an employer as the partisan member to represent its employees in a PLB arbitration. *Id.* at *2, 8. The court noted that Section 153, Second requires that the partisan member be "an individual *associated in interest* with the carrier or representative he is to represent." *Id.* at *6 (emphasis added). Interpreting this language, the court found that the NMB could not designate as a partisan member a representative not aligned

with the interests of the employee.  *Id.*  As the court explained, the "employee is by statute entitled to have as his [PLB] member representative one whose partisanship will be directed toward the employees' interest, and not a neutral or as here, toward the private adverse interest of the one purportedly representing the employee."  *Id.*

These cases addressed *who* could request designation of a partisan member and *who* could serve as a partisan member.  So they raised issues within the scope of the NMB's express authority under the RLA.  And in each case, the designation would have contravened the plain language of Section 153, Second.

SMART-TD's prior lawsuit raised a similar issue.  It argued that the Railroads' request to designate a partisan member violated Section 153, Second because the plain language allowed only a single carrier to make that request.  Compl. ¶ 34, *SMART-TD I.*

But that is not the issue here.  SMART-TD does not argue that the wrong Railroad asked the NMB to designate a partisan member, or that Leonard is not an appropriate partisan member to represent the GCAs.  SMART-TD instead asks the Court to impose an obligation on the NMB outside the plain text of Section 153, Second.  That is a step too far.

Consider *CSX Transportation, Inc. v. National Mediation Board*, No. CIV.A. 04-0611 (RWR), 2005 WL 2297554 (D.D.C. Aug. 29, 2005)—another case SMART-TD cites.  There, the plaintiff moved to enjoin the NMB from consolidating 31 PLBs created to hear disputes between a carrier and a representative of the carrier's employees.  *Id.* at *3.  The court granted the injunction.  Surveying the RLA, the court found that "[t]here is no statutory language permitting [the NMB] to establish a PLB."  *Id.* at *6.  The NMB "becomes involved only at a party's request, and only to designate a member to represent a party, or to appoint a neutral."  *Id.*  As the court explained, "[t]here is no statutory language permitting [the NMB] to decide or change the

jurisdictional scope of a PLB." *Id.* The court found that "Congress was clear in providing how a PLB could be established and by whom, and [the NMB's consolidation] Order is directly contrary to the statutory language." *Id.*

The same principles apply here. "Congress effectively has provided a who, what, when, and how laundry list governing the [NMB's] authority" as it relates to PLB arbitrations. *Cf. Ry. Lab. Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 667 (D.C. Cir. 1994) (en banc) (cleaned up). And nowhere does the RLA delegate to the NMB the task of resolving issues over the establishment and jurisdiction of a PLB. Those issues must be resolved by the parties, their partisan members, or a procedural neutral.

For the same reasons, the Adjustment Board arbitration cannot dictate when the NMB can designate a partisan member, as SMART-TD suggests.

Section 153, Second offers three pathways for a PLB arbitration:

> If written request is made upon any individual carrier by the representative of any craft or class of employees of such carrier for the establishment of a [PLB] to resolve disputes otherwise referable to the Adjustment Board, *or* any dispute which has been pending before the Adjustment Board for twelve months from the date the dispute (claim) is received by the [Adjustment] Board, *or* if any carrier makes such a request upon any such representative, the carrier or the representative upon whom such request is made shall join in an agreement establishing such a [PLB] within thirty days from the date such request is made.

45 U.S.C. § 153, Second ¶ 2 (emphasis added). So either a rail carrier or labor union can issue a written request to the other to form a PLB arbitration. If there is already a "pending" Adjustment Board arbitration involving the same "dispute (claim)," a PLB can form only after that arbitration has lasted at least twelve months. *Id.*; *see* Def.-Intervenors' Opp'n at 18.

SMART-TD's challenge rests on the premise that the arbitration with the Adjustment Board involves the same dispute and was "pending" *before* the PLB arbitrations. So the PLBs— and, by extension, the NMB's designation of a partisan member to the PLBs—must wait until

the Adjustment Board arbitration has lasted at least twelve months.  *See* Pls.' Reply at 21 ("The 'twelve months' language found in the first sentence of the paragraph applies to everything thereafter and it is unreasonable to read the [RLA] as sanctioning the NMB to facilitate establishment of a PLB that is otherwise barred.").

This logic is flawed.  It requires the NMB to reach two threshold issues that the RLA allocates elsewhere:  Whether the Adjustment Board arbitration came first, and whether it involves the same labor dispute pending before the PLB arbitrations.  These are questions that speak to the "establishment and jurisdiction" of the PLBs.  45 U.S.C. § 153, Second ¶ 2.  So they must be decided by the partisan members or a procedural neutral during the PLB arbitration, not by the NMB or this Court.[9]

In authorizing the NMB to designate a partisan member, Section 153, Second speaks only to that task:  "Upon receipt of a request for such *designation*, the [NMB] shall promptly *designate* the carrier or representative he is to represent."  *Id.* (emphasis added).  The RLA requires only a "prompt" designation.  *Id.*  It does not require the NMB to confirm whether a PLB preceded an Adjustment Board arbitration or involves the same labor dispute before making a designation.

Several unresolved questions remain.  Did the Adjustment Board arbitration predate the PLB arbitrations?  Do the two involve the same labor disputes?  If yes to either, can the PLBs proceed in parallel with the Adjustment Board?  The parties' arguments show that the answers to these questions are not straightforward.

---

[9]  Thus, the Court need not—and cannot—address the parties' disagreement over which arbitration came first and whether the same dispute is "pending" before the PLB and Adjustment Board.  *See* Pls.' Reply at 9–19; Def.-Intervenors' Opp'n at 19–20, 22.  The procedural neutral ultimately assigned to the PLB arbitrations must resolve these disagreements.

One point is clear, however. The NMB lacked the authority to resolve them. The NMB followed its sole statutory mandate when it designated Leonard to serve as the partisan member for the GCAs at the Railroads' request.

For these reasons, SMART-TD fails to state a claim under the RLA or APA, or show a likelihood of success on the merits to support injunctive relief. The Court will grant NMB's motion to dismiss.

## B.

After the Supreme Court's decision in *Winter*, failure to show a likelihood of success on the merits—the "most important factor"—may be enough to deny SMART-TD's request for injunctive relief. *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr.*, 639 F.3d at 1088. But there is another, independent reason to deny injunctive relief. SMART-TD has not shown irreparable harm.

SMART-TD's principal theory of irreparable harm is that without an injunction it will be forced to participate in the PLB arbitrations. Pls.' Mot. at 26. It relies on cases finding that compelled arbitration causes irreparable harm because the parties did not agree to arbitrate in the first place. *See id.* at 26–27 (citing cases); Pls.' Reply at 23 (arguing "forced participation in such an arbitration is itself irreparable harm.").

For example, SMART-TD cites *Washington Metropolitan Area Transit Authority v. Local 689, Amalgamated Transit Union*, 113 F. Supp. 3d 121 (D.D.C. 2015). There, the court found that the plaintiff would suffer irreparable harm if forced to arbitrate the grievances of non-employees because the plaintiff did not have to do so under its agreement. *Id.* at 128. The court also determined that requiring arbitration of a different grievance it found non-arbitrable also constituted irreparable harm. *Id.*

Such cases do not apply here.  As explained, the RLA *does* require SMART-TD to arbitrate before the PLB, including any disputes over its establishment and jurisdiction.  *See BNSF Ry. Co.*, 973 F.3d at 334 (the "RLA sets out a mandatory and virtually endless process of negotiation, mediation, voluntary arbitration." (cleaned up)).  So compelling its participation in the PLB arbitrations here cannot meet the high bar to show irreparable harm.  *Accord Diwan v. EMP Global LLC*, 841 F. Supp. 2d 246, 249–50 (D.D.C. 2012) (rejecting argument that "allowing arbitration proceedings to begin before determining arbitrability would constitute 'per se' irreparable injury" in part because the plaintiff was party to an agreement that "clearly called for arbitration of disputes"); *cf. Sears, Roebuck & Co. v. NLRB*, 473 F.2d 91, 93 (D.C. Cir. 1972) (per curiam) ("Irreparable harm cannot be established by a mere reliance on the burden of submitting to agency hearings.").

SMART-TD's theory of irreparable harm also is theoretical, not actual.  *Wis. Gas Co.*, 758 F.2d at 674.  It rests on the assumption that any procedural neutral will reject its challenges to the PLBs.  But this is premature.  As of now, the partisan members are seeking to designate a procedural neutral to resolve their disputes.  *See* Reply in Supp. of Def.'s Mot. to Dismiss at 2 n.3.  So it remains possible that the procedural neutral agrees with SMART-TD and finds that the Adjustment Board arbitration precludes proceeding with the PLBs now.  Since SMART-TD can still raise its challenges in the PLB arbitrations, it cannot show irreparable harm.  *Accord Johnson v. Holway*, 329 F. Supp. 2d 12, 19 (D.D.C. 2004) (finding plaintiff's alleged harm "too remote and speculative to warrant injunctive relief" with no "basis for believing that the arbitrator will accept a settlement that is contrary to the best interests of the union members").

SMART-TD also suggests that Leonard's (or any other individual's) forced participation as a partisan member in the PLBs violates the First Amendment as compelled speech.  Pls.' Mot.

at 28; Pls.' Reply at 25.  Not so.

For starters, SMART-TD fails to explain how it has standing to raise a First Amendment challenge on behalf of Leonard, who is not party to this action.  And the Court is skeptical that such standing exists.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (cleaned up)).

In any event, the First Amendment's compelled speech framework applies only when "an individual must personally speak the government's message," or at limited times when the government forces "one speaker to host or accommodate another speaker's message."  *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006).  Neither applies here.

The Railroads requested, and the NMB designated, Leonard as the partisan member based on his role as SMART-TD's vice president.  *See* Def.-Intervenors' Opp'n Ex. J, ECF No. 18-11.  His resignation from that office would lead to a different designation.  If Leonard remains, there is no evidence that the NMB will dictate the content of Leonard's speech during the PLB arbitrations.  Leonard is free to advance the same challenges raised here, or remain silent during the entire arbitration.  *See* Def.-Intervenors' Opp'n at 28 n.8.  His speech remains his choice.  And SMART-TD fails to explain how participation in the PLBs itself is either speech or expressive conduct.

Relatedly, SMART-TD argues that the GCAs did not authorize Leonard to represent them in the PLB arbitrations so his designation "directly and immediately impairs their interests as well as those of SMART-TD and Mr. Leonard."  Pls.' Mot. at 26.  This is so, it contends, because the NMB seeks to "unwillingly bind parties together as participants" and "shape the

composition of the arbitration board against the will of a board member himself."  Pls.' Reply at 24.

But these injuries are self-inflicted.  The Railroads and the NMB have followed the clear directives set out in the RLA.  SMART-TD and the GCAs have not.  They rejected the Railroads' request to appoint a partisan member, which is why the NMB designated Leonard in the first place.  So they cannot now manufacture irreparable harm from their intentional decision not to appoint a partisan member.

The Court thus finds SMART-TD has not made a clear showing that it will suffer irreparable harm without an injunction.  This is a separate basis to deny SMART-TD's motion for a preliminary injunction.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

*      *      *

The principles of the RLA and NLGA further militate against an injunction.[10]  The express purpose of the RLA is to "provide for the prompt and orderly settlement of all disputes" related to "rates of pay, rules, or working conditions," or "the interpretation or application of agreements covering" these matters.  45 U.S.C. § 151a.  And the NLGA embodies a "firm policy . . . of limiting federal court intervention in private labor disputes."  *In re Dist. No. 1-Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n (AFL-CIO)*, 723 F.2d 70, 75 (D.C. Cir. 1983).

SMART-TD thus far has failed to resolve its dispute with the Railroads in a "prompt and orderly" way.  45 U.S.C. § 151a.  This case represents the second attempt in the same year to halt arbitration procedures outlined in the RLA.  And SMART-TD has now raised its challenges in

---

[10] SMART-TD and the Railroads disagree about whether the restrictions of the NLGA should apply here.  *See* Def.-Intervenors' Opp'n at 29–31; Pls.' Reply at 27–30.  The Court need not resolve this question because, as explained, SMART-TD has not made a clear showing that it is entitled to injunctive relief even under the standard factors for a preliminary injunction.

three different fora.  With the principles of the RLA and NLGA in mind, the Court declines to issue an injunction in favor of SMART-TD.

**IV**.

For these reasons, the Court will grant NMB's motion and dismiss the Complaint.  The Court will also deny SMART-TD's motion for a preliminary injunction.  A separate Order will issue.

Dated:  November 20, 2020                                    TREVOR N. McFADDEN, U.S.D.J.